FOUNTAIN VALLEY LAND & IRRIGATION CO. et al. v. PEARSONS.†

(Circuit Court of Appeals, Eighth Circuit. November 26, 1912.)

No. 3,702.

BROKERS (§ 75*)—COMMISSIONS—AGENCY TO SELL LAND AT NET PRICE—RIGHTS IN NOTES FOR DEFERRED PAYMENTS.

A land company, owning a large tract of land, with irrigation rights, and a trust company, which as trustee held a mortgage thereon to secure bonds of the land company, joined in a contract by which complainant was given the exclusive right for a limited time to make sales from the tract at not less than $75 per acre net, all above that obtained by complainant to belong to him as commission. On receipt by the trust company of 20 per cent. of such net price in cash, and notes secured on the land sold for the deferred payments, both companies agreed to make deeds conveying the land sold free of the mortgage. Complainant made sales at $100 an acre, taking notes and a single mortgage from each purchaser for deferred payments, including, not only the unpaid portion of the net price, but also of his commission, and such notes and mortgage were turned over to the trust company. Held that, as between him and the land company and trust company, he was not entitled to an undivided interest in such notes and to receive a share of all payments thereon as made, but that the trust company was entitled to all payments until the full net price had been received; such company not having made any agreement or taken any action inconsistent with such right.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 75.*]

Appeal from the Circuit Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied February 17, 1913.

Suit in equity by H. P. Pearsons against the Fountain Valley Land & Irrigation Company and the Continental Trust Company. Decree for complainant, and defendants appeal. Reversed.

Henry McAllister, Jr., and Richard McKnight, both of Denver, Colo. (Joel F. Vaile, William N. Vaile, Frederick T. Henry, and Marvin H. Farrington, all of Denver, Colo., on the brief), for appellants.

William V. Hodges, of Denver, Colo. (Mason A. Lewis, of Denver, Colo., on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and W. H. MUNGER, District Judge.

CARLAND, Circuit Judge. The facts which gave rise to this litigation are as follows:

On May 1, 1908, the Fountain Valley Land & Irrigation Company (hereinafter called the Land Company) was the owner of a tract of land located in El Paso county, Colo., with appurtenant water rights. On that day it executed and delivered to the Continental Trust Company (hereinafter called the Trust Company) a first mortgage or deed of trust on all of its lands and water rights to secure an issue of $500,000 of first mortgage bonds of the Land Company, bearing interest at 6 per cent. per annum. Prior to September 28, 1908, $309,600 in amount of said bonds had been issued and were outstanding; $94,600 having been sold and $315,000 pledged. Since the date of issue all of said bonds have been outstanding in the hands of various parties, and after September 28, 1908, and before this suit was instituted, the remainder of the bonds were duly issued and sold.

The only provision in the trust deed respecting the sale of the mortgaged property and its release from the operation of the lien thereon was contained in article 3, which was as follows:

"The Land Company shall have the right to sell, upon cash or deferred payments, the real estate and lands hereby conveyed, and the water rights or shares of stock representing water rights for the irrigation of land, for cash, or for part cash and the balance on time, the balance to be represented by contract or notes secured by a lien upon the water rights sold and the lands upon which the water is to be used, or in case of the sale of land to be secured by conditional contract or by mortgage upon the land or land and water sold. In no event shall the amount of the cash payment be less than 20 per cent. of the total selling price. The minimum price at which water can be sold shall be at the rate of $1,950 per cubic foot, and the minimum price at which land can be sold shall be at the rate of $5 per acre, and the minimum price at which land with water can be sold shall be at the rate of $35 per acre.

"All cash payments, commissions to selling agents having been first paid therefrom, shall be made to the trustee, and all notes or contracts for deferred payments shall be duly assigned to the trustee, and by it held in accordance with the terms hereof. Thirty (30%) per cent. of all moneys received shall be turned over to the Land Company; the other seventy (70%) per cent. shall be turned into the sinking fund as hereinafter provided.

"In the event of sales in accordance with the terms of this article, the trustee shall, as soon as the land or water purchased is paid for in full, convey to the purchaser such land and water, free and clear from the incumbrance hereof."

·· September 28, 1908, a tripartite agreement between the Land Company, the Trust Company, and F. H. Wilhite and H. ·P. Pearsons;. known as the Pearsons-Wilhite Company, was entered into. The object thereof was to constitute Wilhite and Pearsons, or a corporation to be organized by them, sole selling agents for a limited period. The agreement recited the ownership of the land and water rights by the Land Company, the trust deed conveying the same to the Trust Company, and appointed Wilhite and Pearson's exclusive agents to sell such land and water rights. The net price at which the first 2,000 acres of irrigable land should be sold was fixed at $75 per acre, and the method of payment of this net price and the conveyance of the land sold and its release from the mortgage was thus specified:

"4. The said Land Company promises and covenants that when 20% of the net price per acre for land sold has been paid in cash to the Trust Company, and the remainder of the net price has been paid to the Trust Company in notes secured by a first mortgage on the land sold, which notes shall be in equal amounts payable annually for a period of not to exceed eight years and bearing 6% annual interest, it (the said Land Company) will deliver· to the parties of the third part (the selling agents) for each of the purchasers to whom land has been sold an abstract of title to the land sold and also a good and sufficient warranty deed executed by it and also by the Trust Company for the purpose of releasing said land from the lien of the trust deed aforesaid, which warranty deed shall name a consideration and a grantee, that the parties of the third part, their successors and assigns, may indicate.

"5. The Trust Company promises and covenants on its own behalf to execute the deeds as hereinabove referred to for the purpose of releasing the lien of the said trust deed, it being expressly understood that it is not in any way to be responsible for the delivery of the deed by the Land Company or for the acts to be performed by any of the parties hereto except itself, and that it will in no event be bound by any warranty or guaranty clause contained in said deed—the form of the deed to be executed to be approved by it."

The commission or compensation to the selling agents was provided for as follows:

"6. The Land Company promises that the parties of the third part, their successors and assigns, as hereinafter stated, shall have for their commissions and entire pay for selling its lands with water rights all amounts that they may obtain from purchasers over and above the respective net prices per acre hereinbefore stated."

Wilhite and Pearsons assigned their contract to the Pearsons-Wilhite Company, which proceeded to sell land thereunder, and the Land Company conveyed to the purchasers the tracts sold, and the Trust Company released the land from the operation of the general trust deed.

Most of this land was sold at $100 per acre, of which $75 was the net selling price, and the balance represented commission. Instead of requiring the entire commission to be paid in cash, or having the same secured by a second mortgage inferior to the mortgage representing the deferred payment of net purchase price to the Land Company, the Pearsons-Wilhite Company caused the notes and mortgages given by the purchasers of land, representing the unpaid purchase price, to include, not only the unpaid portion of the net purchase price, but also their unpaid commission. After this was done the notes and mort-

gages, which were prepared and executed under the supervision of the Pearsons-Wilhite Company, were forwarded to the Land Company and by it deposited with the Trust Company under the terms of the trust deed. Each of these notes or series of notes had pinned to it or them a slip which in most cases read, "One-fourth of this note is owned by the Pearsons-Wilhite Company," that being the proportion which the commission included therein bore to the face amount. The only variation in the form of this slip consisted in a difference, in a few cases, of the fractional interest, due to variation in the gross selling price.

The inclusion by the Pearsons-Wilhite Company of the unpaid commission in the notes and mortgages taken from the purchasers of land was with the consent of the Land Company. So far as the Trust Company is concerned, it was not a party to any agreement that this should be done, and that company does not appear to have been taken into consideration until a controversy arose as to the propriety of the practice, to which it then demurred. It would appear from the testimony of the witness Johnston that the Pearsons-Wilhite Company did not wish the purchasers of the land to know the amount said company was receiving as commission. After this procedure had been followed for several months, and several tracts of land had been sold, and the notes and mortgages, representing not only the deferred net purchase price, but the unpaid compensation of the Pearsons-Wilhite Company, had been placed in the hands of the Trust Company, the Pearsons-Wilhite Company made a request upon the Land Company and the Trust Company for a segregation and delivery to it of sufficient of the notes and mortgages to cover the amount of their compensation included therein. This request, upon the advice of counsel, was refused. Thereafter, in all sales of land made, the Pearsons-Wilhite Company secured its compensation by second mortgages upon the property.

After the contract in question had expired, and on October 1, 1910, this suit was begun by Pearsons, as assignee of the Pearsons-Wilhite Company, for the purpose of fixing and determining his interest in the notes and mortgages in the hands of the Trust Company. The Circuit Court adjudged that Pearsons was entitled to a decree against both the Land Company and the Trust Company, fixing the proportionate amount to which he was entitled as assignee of the commissions in the several notes originally given by each purchaser of land and turned over to the Trust Company, and declaring that as to such amount, with accruing interest thereon, the Trust Company took and held the same in trust for said Pearsons, that as to all sums paid to the Trust Company on said proportionate interest in said notes Pearsons should have a money judgment for the amount thereof, and that as to all unpaid amounts, both principal and interest, representing said commissions, the Trust Company held the same for the use and benefit of Pearsons and should account to him therefor, and the Trust Company was ordered to turn over the same to complainant in money when collected. The Circuit Court held against Pearsons as to his claim that there was an oral agreement whereby the interest of the Pearsons-Wilhite Company should be paid by turning over notes and mort-

gages equal to the amount of the commissions due the Pearsons-Wilhite Company. Pearsons not having appealed, this finding of the court is not open to review.

The Land Company and the Trust Company do not dispute that the commissions claimed by Pearsons are included in the notes and mortgages which they hold, but they insist that the interest of Pearsons in the notes and mortgages is subordinate to the rights of the Land Company and the Trust Company, and that until the net purchase price included therein is fully paid to the Land Company and the Trust Company, with interest thereon, Pearsons is not entitled to any of the proceeds thereof.

It cannot be disputed that the Land Company and the Trust Company were to receive $75 net for every acre of land sold by the Pearsons-Wilhite Company, whether the latter received any commission or not. The Land Company and the Trust Company were in no way interested in the amount of the commission that should be received by the Pearsons-Wilhite Company, nor was the latter in any way interested in the $75 per acre which the former were to receive for the land. We cannot attach any importance to the fact that each of the purchase-money notes was accompanied, when turned over to the Land Company, by a slip of paper reading that "one-fourth of this note is owned by the Pearsons-Wilhite Company," and that this slip followed the notes into the possession of the Trust Company. The only knowledge that would be imputable to the Land Company or the Trust Company from the slip of paper itself would be that the commissions of the Pearsons-Wilhite Company were included in the amount of the notes. They knew that the contract empowering the Pearsons-Wilhite Company to sell did not give the latter any interest in the net price of the land, and they knew that they were entitled to receive the net price in any event.

Again, neither the Land Company nor the Trust Company ever acted with reference to this slip in any way which would be only consistent with the adoption by them of the meaning now sought to be placed upon it by the Pearsons-Wilhite Company. On the contrary, the Land Company and the Trust Company repudiated any such understanding when the Pearsons-Wilhite Company claimed that they were the owners of an undivided interest in the notes.

Wiggins Ferry Co. v. O. & M. Railway, 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055, is cited in support of the proposition that it is not necessary that a party should formally agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties which are only consistent with the adoption of such contract. The facts in this case do not make the decision in the case cited applicable, for the reason that the Trust Company never entered into any relations with either of the other parties which would be only consistent with the adoption of the meaning now sought to be given to the words indorsed on the slips of paper. To hold on the present record that Pearsons owns an undivided interest in the notes and mortgages held by the Trust Company would make him a part-

ner with the Land Company and the Trust Company in the net proceeds arising from the sale of the land, contrary! to the written contract of the parties. If the Pearsons-Wilhite Company waived its right to take its commission in cash or second mortgage, and allowed the amount of the commission to become a part of the amount for which the notes were given for the purchase price of the land, it still remains true that Pearsons must now wait until the Trust Company has received the net purchase price of the land, for the reason that to hold that Pearsons is jointly interested in the whole amount of the note might result in his obtaining his commission, whether the Land Company and the Trust Company received the net purchase price or not. Neither the Trust Company nor the Land Company agreed to pay the Pearsons-Wilhite Company any commission for selling the land. Pearsons-Wilhite Company was to obtain its commission from the purchaser or purchasers, and this commission was to be the amount paid for the land over and above the net price. Until the Land Company and the Trust Company are paid the net price, there is no excess over and above such price. The giving of the note and securing same by mortgage was not a payment of the purchase price of the land, in the absence of an agreement that it should be taken as payment. The giving of the note and mortgage simply deferred the payment.

We are clearly of the opinion that Pearsons is not entitled to a decree adjudging him to be the owner of an undivided interest in the notes and mortgages held by the Trust Company and Land Company, but that he is only entitled to his commissions after the net selling price of the land has been paid. The only difference between our view and that of the trial court is as to the time when Pearsons may demand payment of his commissions. The trial court held that he was entitled to a proportionate interest whenever a payment was made on the notes. We hold that he is not entitled to be paid his commissions until the purchase price is fully paid.

The decree appealed from must be reversed, and the case remanded to the United States District Court for the District of Colorado, with direction to enter a decree not inconsistent with the views herein expressed; and it is so ordered.